**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**WHEELING DIVISION**

**DONALD RICHARD HENRY KELLEY, II,**

        **Plaintiff,**

**v.**
                                    **Civil Action No.: 5:11-CV-73**
                                    **JUDGE STAMP**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

        **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT THE DISTRICT COURT GRANT IN PART AND DENY IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [12], GRANT IN PART AND DENY IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [15], AND REMAND THE DECISION OF THE ADMINISTRATIVE LAW JUDGE WITH INSTRUCTIONS**

## I.   INTRODUCTION

On May 16, 2011, Plaintiff Donald Richard Henry Kelley, II ("Plaintiff"), by counsel David E. Furrer, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1.) On July 19, 2011, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 4; Administrative Record, ECF No. 5.) On October 19, 2011, and December 19, 2011, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 12; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 15.) Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.    BACKGROUND

### A.    *Procedural History*

On November 26, 2007[1], the Plaintiff protectively filed a Title II claim for disability insurance benefits ("DIB") and a Title XVI claim for supplemental security income ("SSI"), alleging disability beginning July 2, 2006.  (R. at 98-104.)  These claims were denied initially on May 22, 2008 and then upon reconsideration on November 6, 2008.  (R. at 50-71.)   On November 25, 2008, Plaintiff filed a written request for a hearing (R. at 102), which was held before United States Administrative Law Judge ("ALJ") Drew A. Swank, on November 20, 2009 in Hagerstown, Maryland.  (R. at 24, 29-49.)  Plaintiff, represented by a paralegal, Shirley J. Shears, appeared and testified.  (R. at 32, 29-49.) There was no vocational expert present. (R. at 33). On February 26, 2010, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act.  (R. at 13-24.)  On March 22, 2011, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-5.)

### B.    *Personal History*

Plaintiff was born on August 25, 1968, and was 39 years old at the time he filed his DIB and SSI claims.  (R. at 98.)  The highest grade of school that he completed was ninth grade. (R. at 129.) His prior work experience is as a crew trainer for a fast food restaurant. (R. at 124.)[2] He has never

---

[1]  It appears that although the application was considered filed on November 26, 2007, the application was completed by phone on February 7, 2008 and stored electronically. (R. at 101.)

[2]  The Plaintiff's Brief erroneously indicates that the "Plaintiff's past relevant work included tree service, a forklift operator, and then in IT support (R. 30)."  (Pl.'s Mem in Support of Mot. for Summ. J. ("Pl.'s Brief."), at 5-6,  ECF No. 12-1.)

been married and has no children. (R. at 102.)

## C.    *Medical History*

### 1.    **Medical History Pre-Dating Alleged Onset Date of July 2, 2006**

Records from Valley Family Practice indicate that on March 30, 2005, the Plaintiff visited Robert W. Duck, M.D. (R. at 205.)  Dr. Duck referred to the Plaintiff as a new patient.  He indicated in his records that Plaintiff is "otherwise healthy except for a toxic birth injury affecting his right leg." (*Id.*)  The doctor's records further indicated that Plaintiff was taking Dolabid 500 mg as needed for headaches at the time.  (*Id.*)  The doctor noted that Plaintiff is a "well appearing white male, no apparent distress." (*Id.*)  Dr. Duck's assessment and plan for Plaintiff's complaints were as follows: Chest pain complaints are likely reflux and Plaintiff was given samples of Aciphex; Headaches complaints sound like migraine/cluster and Plaintiff was given prophylaxis with propranol and told that he must completely cease using caffeine. (*Id.*)  The Plaintiff's stress test was negative.  (R. at 207-08.)

On May 10, 2005, the Plaintiff had a follow up visit with Dr. Duck concerning his ongoing headaches and chest pain.  (R. at 204.)  Plaintiff reported that his headaches occurred every day but diminished in intensity.  (*Id.*)  Plaintiff discontinued the propranol because he noticed no difference while he was  on it.  (*Id.*)  Plaintiff also indicated that his chest pains continued with no real improvement from the Aciphex.  (*Id.*)  In response to the Plaintiff's complaints, Dr. Duck changed his medication to Cardizem LA 180mg and requested a follow up in the near future.  (*Id.*)

On July 23, 2005, Plaintiff was seen in the emergency room of the Winchester Medical Center.  (R. at 192.)  The Plaintiff's complaints were headache and chest pain.  (R. at 194.)  Chest x-rays were taken and the doctor noted "Heart and mediastinum remain stable and within normal

limits and lung fields are clear. No effusions present. There is evidence of granulomatous disease."

(*Id.*) The clinical impressions of the doctor were headache, atypical chest pain and probable

sacetica. (*Id*.) There is a notation from a nurse that the Plaintiff refused to answer questions and

refused to allow the medical exam. (R. at 200.) The nurse quoted the Plaintiff as saying "I only

want my pain med. I know what is wrong." (*Id.*)

On October 26, 2005, the Plaintiff reported to the emergency room of Jefferson Memorial

Hospital. (R. at 175.) The Plaintiff complained of right hip pain radiating down his legs and back

up. (*Id.*) The clinical impression was that the Plaintiff suffered from chronic low back pain. (R.

at 179.) He was given prescription medication and sent home. (*Id.*)

On December 15, 2005, Plaintiff again reported to the emergency room of Jefferson

Memorial Hospital. (R. at 170.) The record shows that Plaintiff was complaining of swelling and

tingling in his left hand. (*Id.*) The clinical impression was Tenosynovitis of the left wrist (R. at

174.) A medication was prescribed and Plaintiff was sent home. (*Id*.)

On December 20, 2005, Plaintiff went to Valley Family Practice complaining that he had

hurt his left hand on the job on December 14, 2005. (R. at 202.) Plaintiff complained that the pain

in his left hand went all the way up to his neck. (*Id.*) Plaintiff was seen by Morris, CFP and

prescribed N-Saids-Ibuprofen (136 vits). (*Id.*) Plaintiff was given a note to be excused from work

from December 18- 25, 2005. (*Id.*) Plaintiff was to return to work on December 26, 2005. If

Plaintiff did not improve he was to return to the doctor in seven (7) days. (*Id.*)

On December 21, 2005, the Plaintiff visited the emergency room of the Winchester Medical

Center. (R. at 189.) His chief complaint was wrist and hand pain. The Plaintiff's wrist was

examined and the doctor found "no bony abnormality." (R. at 190.) The Plaintiff's hand was

examined and the doctor found that Plaintiff's third finger had been amputated in the past. (*Id.*) "The remaining bones and joint spaces appear intact. No destruction lesion or fracture or periosteal reaction." (*Id.*)

On January 29, 2006, the Plaintiff again visited the emergency room of the Winchester Medical Center. (R. at 180.) His complaint was joint aches and pains. He was diagnosed with arthritis and told that he needed to get a referral from his regular doctor to see a rheumatologist. (R. at 182.) On February 8, 2006, the Plaintiff returned to Valley Family Practice complaining of pain in his ankles, knees, wrists and everywhere. (R. at 201.) Plaintiff was treated and discharged. (*Id.*)

## 2. Medical History Post-Dating Alleged Onset Date of July 2, 2006

On October 23, 2007, the Plaintiff had his first visit to Shenandoah Valley Medical Systems. (R. at 229, 241.) The Plaintiff was referred by the AIDS network after being told that he may have been exposed to hepatitis by the Washington County Health Department in September of 2007. (*Id.*) The record indicates that his chronic problems at the time were HIV, Hepatitis B Carrier and Hepatitis C carrier; furthermore, he was not on any medication. (*Id.*) The record also indicates that "[h]e raises dogs for a living and does not have a support system from family." (*Id.*)

On December 19, 2007, Plaintiff had another office visit to Shenandoah Valley Medical Systems. (R. at 226, 243.) The records indicate that he was diagnosed as being HIV positive and that he needed to start treatment. (*Id.*) In addition, Plaintiff is a hepatitis carrier, but that problem would be managed in Frederick, Maryland. (*Id.*) His physical examination on that date was normal. (R. at 227.) The plan was for Plaintiff to start Atripia and go to the AIDS network for medication assistance. (*Id.*)

On January 30, 2008, Plaintiff had an HIV follow up with Shenandoah Valley Medical

System.  (R. at 224 , 246.)  The records indicate that Plaintiff was compliant with medication and was doing well on the medications.  (*Id.*)  Dr. Owunna was the treating physician and Plaintiff's physical examination was normal.  (R. at 225.)

On February 18, 2008, a Routine Abstract Form-Physical was completed by Dr. William S. Miller.  (R. at 214.)  Dr. Miller indicated that the Plaintiff's last visit to his office was November 6, 2004.  (R. at 210.)  At that time, the Plaintiff's complaints were Rheumatoid arthritis, cluster headaches, HIV, Hep b/c, and palsy.  (*Id.*)  Dr. Miller indicated that his treatment of the Plaintiff was normal in all areas.  His diagnosis was arthritis and anxiety, noting that he had not seen the patient in four years.  (R. at 210-14.)

On February 27, 2008, the Plaintiff reported to Dr. Owunna at Shenandoah Valley Medical System for a DHHR physical.  (R. at 221, 248.)  The records indicated that the Plaintiff was recently diagnosed with HIV and was doing well with no side effects from the drug treatment.  (*Id.*)  The notes further indicated that "[h]is last employment was 2 years ago in [M]cdonalds."  (*Id.*)  He complained of chronic fatigue.  (*Id.*)  He was independent in ADL.  (*Id.*)  He was raising dogs intermittently and episodically had pain in both legs that limit his ambulation.  (*Id.*)  The Plaintiff's chronic problems were Osteoarthritis, leg/knee; Cerebral Palsy; HIV; Hepatitis B Carrier; Hepatitis C Carrier; Headache.  (*Id.*)  The physical examination was negative except for back pain and bone/joint symptoms.  (*Id.*)  The lumbar spine had muscle spasm causing moderately reduced ROM. The right knee had tenderness causing moderately reduced ROM and the left knee had tenderness which causes moderate pain with motion.  (*Id.*)  Dr. Owunna noted that Plaintiff "is unable to work because of cerebral palsy and joint deformities and osteoarthritis /RA and will need to see a rheumatologist for tx if approved the medical card."  (R. at 223, 250.)

On March 26, 2008, the Plaintiff had blood work completed and the results were sent to him in the form of a letter from Dr. Owunna on April 2, 2008. (R. at 218.) The blood tests results were normal. (*Id.*) Dr. Owunna indicated that "Cd4 count 346 and viral load 69 improved, stay on the same medications and cholesterol is at goal." (R. at 219.) The assessment on March 26, 2008 was to update Plaintiff's hepatitis A and B vaccinations and recheck his labs. At that time, Plaintiff's last viral load on Atripia was undetectable with last CD4 count 291. (R. at 216, 252.)

On April 17, 2008, in Ranson, West Virginia, the Plaintiff had a disability determination examination conducted by Robert F. Webb, M.D. (R. at 260.) Dr. Webb reported the Plaintiff's medical history as follows: Plaintiff is a 39 year old male with multiple problems. He was born with cerebral palsy, which affected his right leg. (*Id.*) Plaintiff was told that he had rheumatoid arthritis two or three years ago but has not been on any specific therapy because he can't afford to buy prescriptions. (*Id.*) He has been using over-the-counter ibuprofen. (*Id.*) Plaintiff was also told that he had cluster headaches. (*Id.*) These cluster headaches bother him three or four days a week and last for several hours at a time. (R. at 261.) Plaintiff stated to Dr. Webb that the headaches come without warning and that he could not think of anything that may be causing them. (*Id.*) Plaintiff further informed Dr. Webb that he went to the health department in September of 2007 and was diagnosed with hepatitis B, hepatitis C, and HIV antibodies. (*Id.*) Plaintiff does not know how he got these diseases but he has not had any illnesses associated with them at this time. (*Id.*) Plaintiff was started on medication for HIV in December 2007. (*Id.*) Plaintiff further told Dr. Webb that "he does not drive and depends on his family to help him get around." (*Id.*) Plaintiff currently has follow up examinations with Dr. Owunna in Martinsburg, West Virginia every three months. (*Id.*)

Dr. Webb's examination on April 17, 2008 also revealed that the Plaintiff was taking the following medications. In December 2007, he started taking efavirenz, emtricitabine and tenofovir for his HIV and had no problems or side effects with those medications. (*Id.*) Plaintiff does not like to take medication but he does take ibuprofen 200mg a few days a week and can take up to eight in one day. (*Id.*) A social history of the Plaintiff was also taken by Dr. Webb. (*Id.*) His records indicate that Plaintiff "denies tobacco, alcohol, or drug abuse." (*Id.*) Further Plaintiff dropped out of school in the ninth grade to take care of his grandmother. He has worked at several different local McDonald's locations but stopped working two years ago "because of his joint pains and he was unable to find a job." (*Id.*)

Dr. Webb's impressions from his physical examination were as follows: 1. Plaintiff has a history of cerebral palsy with right lower extremity atrophy and weakness. 2. Plaintiff has a history of polyarthralgias and carries a diagnosis of rheumatoid arthritis, which Dr. Webb could not substantiate with the information given. 3. Plaintiff has a history of chronic headaches, which has been diagnosed as cluster headaches. 4. Plaintiff is positive for hepatitis B, C and HIV; and 5. Plaintiff has a history of left sided chest pains. (R. at 263.)

On April 22, 2008, a request was made for the Plaintiff to submit an AFR and he did not do so. (R. at 265.) On May 20, 2008, another request was made for the Plaintiff to submit an AFR (R. at 267.) On May 20, 2008, Dr. Pascasio completed a physical residual functional capacity assessment. (R. at 275.) Dr. Pascasio indicated that Plaintiff alleges cluster headaches, HIV, Hepatitis B and C and Cerebral Palsy. (*Id.*) Dr. Pascasio noted that Plaintiff has mild weakness of the lower extremity with the cerebral palsy and is missing his left distal middle finger. (*Id.*) Further, Dr. Pascasio noted that Plaintiff was unable to walk on his heels and toes but was able to

squat awkwardly. (*Id.*) However, because the Plaintiff had not submitted an AFR, Dr. Pascasio stated that there was insufficient evidence for him to make a physical residual functional capacity assessment (RFC). (*Id.*)

On September 18, 2008, Cindy Osborne, DO, completed a Physical Residual Functional Capacity Assessment on the Plaintiff. (R. at 300.) This assessment indicated that Plaintiff has certain exertional limitations but no postural limitations or manipulative limitations. (R. at 301-303). She indicated that there was no treating or examining source statements regarding the claimant's physical capacities in the file for her assessment. (R. at 306.) After reviewing the records, Ms. Osbourne determined that Plaintiff's RFC should decrease to medium. (R. at 307.) She stated that "[h]is ADL's are not significantly limited. He appears to be mostly credible but does not meet or equal any listing." (*Id.*)

On October 21, 2008, Randolph R. MacDonald, Ed. D. submitted a consultative evaluation report regarding the Plaintiff's mental status. (R. at 308.) The psychologist noted that Plaintiff has no history of mental treatment. (R. at 309.) Plaintiff's prognosis was fair and his capability good. (R. at 310.)

On November 3, 2008, Dr. Philip E. Comer submitted a Mental Residual Functional Capacity Assessment for the Plaintiff. Dr. Comer concluded:

> Claimants's functional limitations do not call for a RFC allowance. He appears to have the mental/emotional capacity for simple work related activity in supportive low stress/demand work environments that accommodate his physical limitations.

(R. at 313.)

The remainder of the medical evidence contained in the record is as follows. On January 27, 2010, a letter was written by Mary Virginia Paletta, CP addressed "To Whom it May Concern." (R.

at 334.)  She stated in her letter that she is Plaintiff's orthotist and has made his ankle foot orthosis

(AFO), leg brace.  (*Id.*)  Her letter was written at the request of the Plaintiff to explain that he has

"weakness, decreased muscle tone and strength on one side of his body."  (*Id.*)  She noted that while

Plaintiff's left leg has normal muscle tone and range of motion, his right leg is not strong or mobile.

(*Id.*)  She emphasized the discrepancy in legs by stating that the calf circumference in Plaintiff's left

leg is fifteen inches while his right calf is only twelve inches in circumference.  (*Id.*)

There is also a letter contained in the record dated December 1, 2010 written by Christopher

J. Murphy, MD from Behavioral Health WVU to the Plaintiff.  (R. at 337.)  Dr. Murphy opines in

this letter that the Plaintiff is disabled due to the severity of his depression.  (*Id.*)  A second letter

written from Dr. Murphy to the Plaintiff on January 11, 2011 states that Plaintiff's symptoms of

depression and anxiety are so severe that he should not be doing any volunteer work outside the

home at this time.  (R. at 336.)

## D.    *Testimonial Evidence*

At the ALJ hearing held on November 20, 2009, Plaintiff testified that he was born on

August 25, 1968 and was 41 years old at the time of the hearing.  (R. at 34.)  Plaintiff further

testified that he lives alone with his dog in a multi-level apartment building in Martinsburg, West

Virginia.  (R. at 35.)  He has to climb one flight of steps to get to his apartment, but once inside his

apartment, it is all one level.  (*Id.*)  Plaintiff attended school through the ninth grade and has never

tried to get his GED.  (*Id.*)  Plaintiff receives food stamps, a medical card, and subsidized housing.

(*Id.*)  He does not have a driver's license because it was suspended years ago for falling asleep at

the wheel.  (R. at 36.)

Regarding employment, Plaintiff has neither worked nor received unemployment or workers'

compensation since July 2, 2006. Nor has the Plaintiff applied for any work since July 2, 2006. (*Id.*) Plaintiff did volunteer every day at the "drop in center" until it closed in October. (R. at 37.)

Regarding pain, Plaintiff testified that he experiences pain every day in his joints, legs, butt cheeks, back, and arms. (*Id.*) Plaintiff further testified that he has taken pain medication prescribed by Dr. Owunna every day from July 2, 2006 until the present. (*Id.*) Plaintiff testified that the pain medication does not help him and that his level of pain is an eight or nine on a scale with ten as the highest pain. (R. at 38.) In addition, with the pain in Plaintiff's hands, he has difficulty lifting a gallon of milk, which is approximately eight pounds. (*Id.*) Plaintiff testified that he can only stand about thirty minutes before needing to sit down and he can only sit for thirty minutes before he has to get up. (*Id.*) Plaintiff can only walk one block at a time, if that, and he uses a cane. (*Id.*) Although Plaintiff has a hard time because of the joint pain, Plaintiff can still move all his fingers, write with his left hand, and use a phone. (*Id.*)

As for every day living, Plaintiff does do his own grocery shopping with the assistance of his mother. (R. at 40.) He prepares his own food. (*Id.*) He cleans his apartment taking breaks every fifteen minutes or so. (*Id.*) Since July 2, 2006, the only yard work or gardening that he has done has been to occasionally pull weeds on his mother's farm, but not much. (*Id.*) Other than caring for his dog, he has no hobbies or special interests and does not have any social activities outside his home. (R. at 41.) Plaintiff does not experience any side effects from his medication and does not go to physical therapy. (*Id.*) When asked by the ALJ whether any health care provider had ever put him on any permanent restrictions, he indicated that Dr. Owunna had told him that he could not go back to work. (*Id.*)

Regarding psychiatric care, the Plaintiff testified that he has been going to East Ridge Mental Health for about a year and is taking medication for depression which helps him. (R. at 42.) His counselor is John Clark. (*Id.*) Plaintiff further testified that he does not smoke, drink or do drugs. (*Id.*)

Plaintiff testified that he has no problem breathing and has no hearing or vision problems. (R. at 42, 43.) He further testified that the HIV virus makes him "get tired and want to sleep all day." (R. at 44.) In addition, Plaintiff states that he recently got a brace for his leg and that he had braces when he was little. (R. at 45.) He states that the brace helps him walk. (*Id.*) Plaintiff testified that he has cluster headaches three or four times a week and they last a couple days. (*Id.*) He further testified that he had three surgeries as a child and never received SSI as a child. (R. at 46).

Regarding chores around the house, the Plaintiff testified that it takes him three days to clean his apartment but he does do the dishes every day. (R. at 47.) He does his laundry at his mother's house. (*Id.*) The Plaintiff lives in public housing and Dr. Owunna has made requests for him to be placed in a first floor apartment. (*Id.*) Plaintiff has to pay $36 in rent but his mother pays it for him. (*Id.*)

Lastly, the Plaintiff testified that his cerebral palsy causes him to have a hard time walking and that sometimes his legs give out. (*Id.*) In addition, he has arthritis and memory problems. (*Id.*)

## E.    *Vocational Evidence*

A report of contact form dated August 26, 2008 states that Plaintiff called to check on the status of his claim. (R. at 153.) The report further indicated that Plaintiff was personal and cooperative. (*Id.*) The DDS officer told him that they needed to clear up some psych impairments

listed in his ADFR. (*Id.*) Plaintiff then stated that he didn't have any psych impairments. (R. at 153.)

A report of contact form dated November 5, 2008 states that the claimant is 40 years old with a ninth grade education and the following past relevant work: Fast Foods Worker 311.472-010 ST-L SVP-2. (R. at 154.) His physical RFC was reported as Medium and his psychological RVC was reported as "simple work in a supportive low stress/demand work environment." (*Id.*) According to the form, the Plaintiff cannot perform his past work but could function as a Rug Cleaner; Cleaner Housekeeping; and Dried Fruit Washer. (*Id.*)

There was no vocational expert at the hearing before the ALJ on November 20, 2009. (R. at 33.) Ms. Shears, Plaintiff's representative at the hearing, asked the ALJ why there was no Vocational Expert present. (R. at 33.) The ALJ replied "Well, Ms. Shears, I'm going to hear the case before I decide I need a VE. And it would be extremely inappropriate to have a VE if we have outstanding evidence–since I base my hypotheticals on the evidence." (R. at 33.)

## F.    *Lifestyle Evidence*

On an adult function report dated August 12, 2008, Plaintiff stated that he spends his days as follows:

> I get up, shower, brush teeth, and get dressed. I do chores for half an hour, then I rest for two hours because of the pain in my hands and legs. After resting, I eat breakfast and start other chores. I usually have to rest for about three to four hours after lunch. After dinner, I watch TV for a few hours and usually go to bed at 8pm.

(R. at 141.) Plaintiff further states that he occasionally feeds his mother's chickens, takes care of a kitten, and milks cows. (R. at 142.) He further states that his mother takes care of the animals when he is in too much pain to do it. (*Id.*) Before his condition, the Plaintiff reports that he could

stand for longer periods of time and he did not get as tired. (*Id.*) Plaintiff states that he does not get enough sleep anymore because the pain keeps him awake at nights. (*Id.*)

Regarding his personal care, the Plaintiff states that it takes him a lot longer to get dressed because of the pain but other than that his condition has not affected his personal care. (*Id.*) Plaintiff does sometimes forget to take his medication. (*Id.*)

As for meals, the report indicates that Plaintiff prepares his own meals such as Ramen Noodles, hot dogs, and peanut butter and jelly sandwiches. (R. at 143.) Plaintiff reports that he used to cook all the time but can't stand for very long now. (*Id.*) Plaintiff states that he is able to do the following chores: do laundry, feed animals, mow the lawn, and milk cows. (*Id.*) However, he does get help with the laundry and mowing the lawn. Mowing the lawn takes about three hours. (*Id.*) Feeding the animals is easy and only takes a few minutes. (R. at 148.) When Plaintiff does laundry, he has trouble lifting and folding clothes. (*Id.*) Milking cows takes one and a half hours. Plaintiff rests for two to four hours after milking cows. (*Id.*)

Plaintiff does not have a driver's license but has family to drive him. (R at 144.) Plaintiff shops for groceries once a week and it takes him about three hours. (*Id.*)

Plaintiff enjoys reading, watching tv, playing with his animals and listening to music. (R. at 145.) His conditions make it more difficult to lift and carry his animals. (*Id.*)

Socially, the Plaintiff stays at home most of the time but he does visit friends and family and talks to them on the phone two to three times per week. (*Id.*) Plaintiff reports that he does not go out as often because of the pain in his legs. (R at 146.)

Plaintiff claims that his condition affects the following abilities: lifting, squatting, bending, standing, reaching, walking, kneeling, use of hands and stair climbing. (*Id.*) Plaintiff states that he

can only lift 25-30 pounds. His leg pain makes squatting and bending difficult. (*Id.*) He claims that he can only stand for five minutes and can only walk fifty yards before he needs to rest for about twenty minutes. (*Id.*) Plaintiff further states that he gets along with authority figures but sometime they make him "angry." (R. at 147.) He has quit jobs because he couldn't get along with a boss. (*Id.*) Plaintiff uses a cane about three days a week when the pain is bad. (*Id.*) Danny L. McCaslin, Jr., case manager, helped Plaintiff fill out the Adult Function Report. (R. at 148.)

On the personal pain questionnaire dated August 14, 2008, Plaintiff reports that he has pain in the joints of his legs and hips. (R. at 149.) The pain lasts all day. (*Id.*) Anytime he walks or does chores he has to rest for a long time. (*Id.*) He moves slower because he has a limp and sometimes uses a cane. (*Id.*) Bad weather makes his joints worse and nothing he takes seems to relieve the pain. (*Id.*) The only medication he lists is Aspirin every six hours. Plaintiff also lists aching, cramping and throbbing pain in his arms, hand and fingers. (R. at 150.) Again, bad weather makes the pain worse. (R. at 151.) The last type of pain listed on his questionnaire is headaches. (*Id.*) Danny McCaslin, Jr., case manager, helped Plaintiff fill out this form. (R. at 152.)

On December 17, 2008, Shirley Shears, from WV Legal Aid, filed a disability report-appeals on behalf of Plaintiff. (R. at 155.) Most notably in that report, Plaintiff claims that he is now suffering from depression and anxiety. (*Id.*)

### III.   CONTENTIONS OF THE PARTIES

Plaintiff asserts that the Commissioner's decision is based upon an error of law and is not supported by substantial evidence. (Pl.'s Mot.) Specifically, Plaintiff alleges that:

• The ALJ erred by improperly evaluating the opinion evidence of Plaintiff's treating physician and did not give them enough weight;

- The ALJ erred by failing to consider the effects of the medication used to treat the Plaintiff's HIV; and

- The ALJ erred by not calling a vocational expert to testify at the hearing.

(Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 8-10, ECF No. 12-1.)  Plaintiff asks the Court to reverse the decision of the ALJ or alternatively remand the case to the Commissioner for further proceedings  (*Id.* at 11.)

Defendant, in his motion for summary judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law."  (Def.'s Mot.)  Specifically, Defendant alleges that:

- The ALJ properly evaluated the opinion evidence of the treating physicians;

- The ALJ's considered all the medical evidence, which included evidence that Plaintiff was doing well on his medications with no real side effects; and

- The ALJ did not err in failing to have a vocational expert present at the hearing.

(Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 6-12, ECF No. 16.)

## IV.    STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied.  *See* 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . .");  *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the

case before a jury, then there is "substantial evidence." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. *See Laws v. Celebrezze*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962). *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit has defined substantial evidence as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. *Laws,* 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability determinations." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** *Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V. DISCUSSION

### A. *Standard for Disability and the Five-Step Evaluation Process*

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(I) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not

disabled at any of the five steps, the process does not proceed to the next step. *Id.*

**B.** *Discussion of the Administrative Law Judge's Decision*

Utilizing the five-step sequential evaluation process described above, the ALJ made the

following findings:

> 1. **The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.**
>
> 2. **The claimant has not engaged in substantial gainful activity since July 2, 2006, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).**
>
> 3. **The claimant has the following severe impairments: hemiplegic cerebral**

palsy with ankle foot orthosis, an affective disorder, asymptomatic HIV infection, hepatitis B and C infection, arthritis (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20CFR 404.1567(b) and 416.967(b) except the claimant is further limited to simple, unskilled that involves limited contact with the general public.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on August 25, 1968 and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 416.1564 and 416.964).

9.    Transferability of job skills is not an issue in this case, because the claimants's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a "disability," as defined in the Social Security Act, from July 2, 2006 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. at 13-23.)

*C.*    *Analysis of the Administrative Law Judge's Decision*

    **1.**    **The ALJ's Step Five Determination Is Not Supported by Substantial Evidence**

At step five of the sequential analysis, if the Plaintiff does not have listed impairments but cannot perform his past work, the burden shifts to the Commissioner to show that the Plaintiff can perform some other job.  20 C.F.R. §§ 404.1520, 416.920; Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).  If a Plaintiff's impairments fall within the exertional categories of the Medical-Vocational Guidelines ("Grids") and there are no further restrictions on those exertional categories by non-exertional factors, the Commissioner's burden at step five is met using only the Grids.  See Gory v. Schweiker, 712 F.2d 929, 930 (4th Cir. 1983).  If a Plaintiff cannot perform the full range of activity covered in a particular category, the Grids do not apply and a vocational expert must be called to testify to satisfy the Commissioner's burden at step five.  Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

> The guidelines do not take into account nonexertional limitations such as pain, loss of hearing, loss of manual dexterity, postural limitations and pulmonary impairment. *Grant v. Schweiker*, 699 F. 2d 189, 192 (4th Cir. 1983). *When nonexertional limitations such as these occur in conjunction with exertional limitations, the guidelines are not to be treated as conclusive. Robert v. Schweiker*, 667 F.2d 1143, 1145 (4th Cir. 1981); 20 C.F.R. Pt. 404, Subpt. P. App. 2 § 100.00(a), (d)-(e)(2); 20 C.F.R. § 404.1569.

Loudermilk v. Astrue, No. 1:07-cv-141, 2009 WL 2584733, at *6 (N.D. W. Va. Aug. 18, 2009).

> Therefore, according to the Fourth Circuit, "whether an ALJ may proper [sic] rely on the Grids depends on whether, in a case where a claimant has both exertional and nonexertional limitations, the facts establish that he retains the RFC to perform all of the exertional demands of a certain level of work.

(*Id.*)

At this point the ALJ will consider the "extent of any erosion of the occupational base" caused by the added restrictions. SSR 83-12, 2009 WL 31253, at *2 (1983).  If the ALJ can determine that the added restrictions have little effect on the occupational base then the Grid rules

may be applied. (*Id.*) However, "[w]here the extent of erosion of the occupational base is not clear, the adjudicator will need to consult a vocational resource." (*Id.*)

The ALJ found in this case that "the additional limitation have little or no effect on the occupational base of unskilled light work."(R. at 24.) However, the undersigned Magistrate finds that this conclusion is not supported with a sufficient explanation based on the evidence in the record.

In this case, the ALJ found that Plaintiff was unable to perform past relevant work. (R. at 23). The Plaintiff was a fast food worker which entails light exertion. (*Id.*) The ALJ found that Plaintiff has the residual functional capacity to perform light work except that the Plaintiff is further limited to simple, unskilled work that involves limited contact with the general public. (R. at 18). The ALJ found that Plaintiff was unable to perform his past relevant work because of these additional social limitations. (R. at 23.)

Therefore, the undersigned Magistrate finds that the Plaintiff has both exertional and nonexertional limitations. Regarding the nonexertional limitations, the ALJ states in his opinion that the Plaintiff has moderate difficulties with social functioning and with regard to concentration, persistence or pace. (R. at 17.) However, the ALJ does not describe the "nonexertional limitations" in enough detail for the undersigned Magistrate to determine whether there is substantial evidence to support the ALJ's finding that those limitations do not significantly erode the light unskilled occupational base so as not to require the testimony of a vocational expert or other vocational resource. In addition, the ALJ asserts that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform based on Medical-Vocational Rule 202.17 and SSR 83-12, 14 and 85-15. (R. at 24.) However, the ALJ does not list any of those jobs in his opinion nor did

he discuss those jobs at the hearing.

The undersigned Magistrate finds that the ALJ's residual functional capacity is supported by substantial evidence in the record. However, the undersigned Magistrate further finds that there is not substantial evidence to support the ALJ's finding that Plaintiff's nonexertional limitations "had little to no effect on the occupational base of unskilled light work" (R. at 24.) Consequently, the undersigned finds that there is not substantial evidence to support the ALJ's finding that jobs exist in significant numbers in the national economy which the Plaintiff can perform.

Accordingly the undersigned recommends that Plaintiff's Motion for Summary Judgment [12] be **GRANTED** as to this issue and **REMANDED** to the Administrative Law Judge to clarify his findings as to Plaintiff's nonexertional limitations for the purposes of using the Grid Rules or, alternatively, to hold a hearing with a vocational expert present. Further, the undersigned recommends that the Defendant's Motion for Summary Judgment [15] be **DENIED** on this issue.

### 2. The ALJ Properly Evaluated and Gave Proper Weight to the Treating Physicians' Opinions

Plaintiff's first assignment of error is that the ALJ improperly evaluated the opinion of his treating physicians. (Pl.'s Mem. at 8-10.) Specifically, Plaintiff alleges that the ALJ "chose to accept the opinions of the DDS medical consultants" when the ALJ should have given "controlling weight" to Plaintiff's treating physician. (*Id.*) The undersigned finds that Plaintiff's argument is without merit because the ALJ notes in his opinion that he gives the DDS medical opinions "little weight." (R. at 23.) The ALJ further notes in his opinion that he gives Plaintiff's treating orthotist's opinion great weight as he believes her opinions to be consistent with the medical evidence. (R. at 20.) However, it appears that Plaintiff is asserting that the ALJ erred in not giving controlling weight to one treating physician in particular, Dr. Owunna. (Pl.'s Mem. at 9-10, ECF No. 12-1.)

In February of 2008, Dr. Owunna opined that Plaintiff was unable to work. (R. at 223, 250).

The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § § 404.1527(d), 416.927(d)(2) (2011); see also Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). When an ALJ does not give a treating source opinion controlling weight and determines that the claimant is not disabled, the determination or decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). However, "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). For example, the Commissioner is responsible for determining whether a claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Therefore, a medical source that offers an opinion on whether an individual is disabled or unable to work "can never be entitled to controlling weight or given special significance." SSR 96-5p, 1996 WL 374183, at *5.

As an initial matter, Dr. Owunna's exact notations on February 27, 2008, regarding Plaintiff's ability to work were made under Assessment/Plan, Routine Medical Exam and were as follows: "He is unable to work because of cerebral palsy and joint deformities and osteoarthritis /RA and will need to see a rheumatologist for tx if approved for the medical card." (R. at 223.) The ALJ states that he gave Dr. Owunna's opinion little weight because it is not consistent with the

longitudinal medical evidence of record and record of prior work activity with the congenital abnormality. (R. at 20-21.) As discussed above, determining whether an SSI applicant is disabled is reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Therefore, the ALJ did not err by not assigning controlling weight to opinions of this nature given by Dr. Owunna.

In addition, there is substantial evidence in the record to support the ALJ's finding that Dr. Owunna's opinion regarding Plaintiff's ability to work should not be given controlling weight. (R. at 205, 210-14.) The ALJ notes that prior to the Plaintiff's onset date of July 2, 2006, there is medical evidence that Plaintiff had lower extremity abnormality, weakness, decreased muscle tone, decreased strength and an abnormal gait, yet the Plaintiff was able to work. (R. at 21-22). In addition, Dr. Owunna's treatment notes consistently revealed a normal review of systems with no side effects from medications. (R. at 215-27.) Plaintiff testified that he is, for the most part, independent in his daily activities. (R. at 40-41.) Plaintiff further testified that he volunteered daily at the "drop in center" in Martinsburg until October 2009 when it closed. (R. at 37.)

Having reviewed the record, the undersigned finds that Plaintiff's first assignment of error is without merit. Dr. Owunna's opinion that the Plaintiff was unable to work is inconsistent with the substantial medical evidence. The ALJ's determination to give Dr. Owunna's opinions little weight is supported by substantial evidence in the record.

Accordingly, the undersigned recommends that Plaintiff's Motion for Summary Judgment [12] be **DENIED** on this issue and Defendant's Motion for Summary Judgment [15] be **GRANTED** on this issue.

### 3. The ALJ Properly Evaluated the Effects of the Medications Used to Treat the Plaintiff's HIV

As the Plaintiff's second assignment of error, he alleges that "the ALJ failed to adequately

consider the effects of the medication used to treat the Plaintiff's HIV. (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 10, ECF No. 12-1) First, the Plaintiff did not start receiving medication for HIV until October of 2007, over a year after his alleged onset date. (R. at 229, 241). Second, the Plaintiff, himself, testified at the hearing before the ALJ that he did not really suffer from any side effects from the medications he takes. (R. at 41.) Lastly, Dr. Owunna noted in his records that Plaintiff was doing well on the medications with no side effects. (R. at 215-27.)

Having reviewed the record, the undersigned finds that Plaintiff's second assignment of error is without merit. The ALJ properly evaluated the effects of the medications used to treat the Plaintiff's HIV based on the medical records and Plaintiff's testimony. Accordingly, the undersigned recommends that Plaintiff's Motion for Summary Judgment [12] be **DENIED** on this issue and Defendant's Motion for Summary Judgment [15] be **GRANTED** on this issue.

## VI. RECOMMENDATION

For the reasons herein stated, I find that substantial evidence does not support the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 12) be **GRANTED** in part and be **DENIED** in part**.** Consequently, I **RECOMMEND** that Defendant's Motion for Summary Judgment (ECF No. 15) be **DENIED** in part and **GRANTED** in part, and the Decision of the Administrative Law Judge be **REMANDED WITH INSTRUCTIONS** that Administrative Law Judge clarify his findings as to Plaintiff's nonexertional limitations for the purposes of using the Grid Rules or, alternatively, to hold a hearing with a vocational expert present.

Any party may, within fourteen (14) days after being served with a copy of this Report and

Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Respectfully submitted this **31st** day of **January, 2012.**


DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE